UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EARNEST J. MALONE,

        Plaintiff,

        vs.

JOHN E. POTTER, POSTMASTER
GENERAL,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 07-05530 MMM (FFMx)

FINDINGS OF FACT AND
CONCLUSIONS LAW

This action was tried to a jury on March 3 through 6, 2009. On March 10, 2009, the jury returned a verdict for plaintiff Earnest Malone on his claims for disability discrimination under the Rehabilitation Act and retaliation for protected activity in violation of Title VII. The jury awarded Malone $300,000 in damages for emotional distress. Malone's entitlement to the equitable remedies of back and front pay was tried to the court on July 21, 2009. Having considered the evidence, the arguments of counsel, and the record in this action, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.   FINDINGS OF FACT

### A.   Summary of Relevant Background Evidence Adduced During Jury Trial

1. Malone's claims for disability discrimination under the Rehabilitation Act and retaliation for protected activity, i.e., filing EEOC complaints, were tried to the jury on March 3 through 6, 2009.  As respects his Rehabilitation Act claim, Malone argued that his supervisor, Postmaster Tyrone Williams, failed reasonably to accommodate him and subjected him to adverse employment action on the basis of his disability when he changed his work assignments in 2007.  Malone also argued that Postmaster McGee subjected him to adverse employment action on the basis of his disability when he transferred him to the Hub City Post Office in 2005.  As respects his retaliation claim, Malone argued that his filing of EEOC complaints was a motivating factor behind these actions.[1]

2. Malone is 53 years old and has a twelfth grade education.[2]  He began working at the Compton Post Office as a letter carrier in 1978; that remained his official position through 2007.[3]  Since 1999, he has filed at least ten employment discrimination claims against the Post Office.[4]

3. Malone injured his right thumb in 1994, and filed a worker's compensation claim as a result.  He subsequently underwent an operation in which his right thumb joint was fused

---

[1]Conceivably, the jury could have reached its verdict based solely on McGee's transfer of Malone to Hub City, and rejected Malone's contention that Williams engaged in discriminatory or retaliatory conduct.  If this were the case, Malone would not be entitled to back or front pay, as the transfer to Hub City did not result in a loss of employment.  The evidence that Williams' reassignment of Malone constituted a failure to accommodate was considerably stronger than the evidence that Malone was transferred as a result of a disability, however.  The court therefore assumes that the jury reached its verdict on this basis.  Indeed, considering the amount of the jury's emotional distress award, it is likely that the jury accepted all theories of liability that Malone advanced.

[2]Reporter's Partial Transcript of Proceedings, March 3, 2009 ("Mar. 3 RT") at 4.

[3]*Id.* at 5; Reporter's Transcript of Proceedings, March 5, 2009 ("Mar. 5 RT") at 104.

[4]Mar. 5 RT at 113.

to his hand.[5]

4.  Dr. Joan Wright, a hand surgeon, testified at trial regarding Malone's injuries.  Wright first saw Malone on October 4, 1996.[6]  Malone went to see Wright because he was concerned that a 25% impairment rating he had received on a worker's compensation claim was incorrect.[7]  The percentage rating represents the degree to which the person is limited and is used to calculate a financial settlement.[8]  Dr. Wright determined that Malone's rating was 31%.[9]

5.  At the time he first saw Dr. Wright, Malone was experiencing pain in his right hand due to the prior operation.  The pain primarily occurred when Malone attempted to pinch.[10]  Because of this pain, Malone had begun to favor his left hand over his right, and was experiencing pain in the left hand as well.[11]

6.  Over the course of Dr. Wright's treatment, Malone began to develop wrist and shoulder pain as well.[12]  Dr. Wright attributed the shoulder pain to bursitis, an inflammation of the sac that separates the shoulder bone from the muscle.[13]

7.  Dr. Wright treated Malone's problems with physical therapy, anti-inflammatory medication, and splints.[14]  She also concluded that he should avoid gripping, pinching,

---

[5]Mar. 5 RT at 8.

[6]*Id.* at 7.

[7]*Id.*  It is unclear whether this was the claim Malone filed in 1994 or a different one.

[8]*Id.* at 7-8.

[9]*Id.* at 8.

[10]*Id.* at 9.

[11]*Id.*; Mar. 3 RT at 15.

[12]Mar. 5 RT at 11-12.

[13]*Id.* at 33.

[14]*Id.* at 13.

1    pushing, pulling and lifting over five pounds.[15]  Dr. Wright selected five pounds as a limit
2    because that was the maximum Malone told her he could lift.[16]

3    8.    Malone did not see Dr. Wright between May 2001 and January 2004.[17]  In January 2004,
4          he again visited Dr. Wright.  He complained that he had been assigned to the Santa Monica
5          Post Office and that the drive was causing him hand and shoulder pain.[18]  At that point,
6          Dr. Wright prescribed arm braces for Malone.[19]

7    9.    In January 2004, Malone also began to see a psychologist, Dr. Barbara Ammon, who
8          testified at trial regarding her opinion of Malone's mental health.  Ammon diagnosed
9          Malone with anxiety disorder, NOS, and depressive disorder, NOS, in January 2004.[20]
10         "NOS" stands for "not otherwise specified" and indicates that the disorders diagnosed by
11         Dr. Ammon did not fit into any specific categort of disorder; Ammon testified that NOS
12         is a "catch-all, left-over diagnosis."[21]  Dr. Ammon stated that Malone's feelings of anxiety
13         and depression resulted from a perception that he was mistreated at work.[22]  When she saw
14         him in January 2004, Dr. Ammon placed Malone on medical leave so that he could
15         "regroup emotionally."[23]  Malone was out of work on Dr. Ammon's orders until May
16         2004.[24]

17    _____

18    [15]*Id.* at 15-16.

19    [16]*Id.* at 17.

20    [17]*Id.* at 18-19.

21    [18]*Id.*

22    [19]*Id.*

23    [20]Reporter's Transcript of Proceedings, March 4, 2009 ("Mar. 4 RT") at 7-8.

24    [21]*Id.* at 8.

25    [22]*Id.* at 7.

26    [23]*Id.* at 10.

27    [24]*Id.* at 11.

28

                                            4

10.  Dr. Ammon testified that Malone's emotional condition was stable between January 2004 and July 2006.[25] She placed him on medical leave for five months in 2005, however, after he became upset over a confrontation with a Postmaster Deer.[26] At this time, Malone experienced difficulty sleeping, suspiciousness, headaches, and gastrointestinal issues.[27]

11.  Malone returned to work in October 2005. During Malone's time at the Post Office, his supervisors had provided him with various limited duty job assignments to fulfill the Post Office's workers' compensation obligations. When he returned in October 2005, he was assigned to work as lobby director at the Hub City Post Office.[28]

12.  As described by Malone, the duties of a lobby director include greeting customers and assisting them to mail items, such as by helping them find the proper forms.[29] Malone was capable of performing the position.[30] He testified that he liked the job and enjoyed working with the public.[31]

13.  Dr. Ammon placed Malone on leave again for one month in June 2006, because she believed he had become increasingly "agitated" and "hopeless."[32]

14.  In July 2006, Malone returned to the Compton Post Office and was assigned to work as

---

[25]*Id.* at 17.

[26]*Id.* at 18-19.

[27]*Id.* at 19.

[28]Mar. 3 RT at 42-43.

[29]*Id.* at 41.

[30]*Id.* at 45.

[31]Mar. 4 RT at 158. At the court trial, however, he testified that he enjoyed working alone, though he also testified that he liked customer service and working with the public. (Reporter's Transcript of Proceedings, July 21, 2009 ("July 21 RT") at 38, 40.)

[32]Mar. 4 RT at 25:1-2.

1  lobby director there.[33]

2  15.   In September 2006, Dr. Wright diagnosed Malone with carpal tunnel syndrome.[34]

3  16.   On July 12, 2007, Malone's supervisor, Postmaster Tyrone Williams told him that he

4  could no longer work as lobby director due to a grievance decision in favor of the postal

5  clerk's union.[35]  Malone was assigned various duties including express mail delivery and

6  custodial work.  While he did not attempt the custodial assignment, he tried to deliver the

7  mail and found he was unable to do it.  Malone told Williams about his inability to deliver

8  to mail, and Williams gave Malone a choice between delivering mail and going home.[36]

9  Thereafter, Malone continue to receive job assignments consisting of various tasks,

10  including mail delivery.[37]

11  17.   In July 2007, Dr. Wright placed the following restrictions on Malone: no repetitive or

12  forceful bilateral hand gripping, pushing, pulling, lifting over five pounds, or overhead

13  activities; a ten minute break after 50 minutes; no driving more than 30 minutes at a time;

14  no standing more than 30 minutes without a break; and no manual opening of letters or

15  stapling.[38]  She testified that she added these restrictions because Malone was "having

16  more problems."[39]  As respects several of the restrictions, Dr. Wright could not recall

17  specifically why she imposed them other than Malone's own description of his limitations.

18  18.   In September 2007, Dr. Wright imposed a new limitation that Malone not do any street

19

20

---

21  [33]Mar. 3 RT at 48-49.

22  [34]Mar. 5 RT at 12.

23  [35]Mar. 3 RT at 44.

24  [36]*Id.* at 46-52.

25

26  [37]*Id.*

27  [38]Mar. 5 RT at 23.

28  [39]*Id.*

delivery of mail.[40]  On September 14, 2007, he obtained a note from Dr. Wright to this effect.[41]

19.  Williams asked Malone to deliver mail on September 14, and sent Malone home when he refused.  The same thing occurred on September 17 and 18.[42]

20.  On September 19, Malone received a new job assignment that included casing and carrying mail.[43]  The job offer stated that Malone's restrictions would not be honored.[44] Malone became upset and walked out of the Post Office.  He did not return to work again.[45]

21.  Dr. Ammon testified that Malone experienced nervousness in 2007 due to the changes in his job assignments and uncertainty as to whether there would be something for him to do when he arrived at the job site.[46]  Because Malone was being given assignments outside his medical restrictions, Dr. Ammon placed him on leave on September 19, 2007.[47] Malone decided to file for disability retirement.[48]  In December 2007, he applied for unemployment benefits.[49]

**B.**   **Relevant Trial Evidence Regarding Malone's Ability to Work**

22.  Malone's future ability to work is one of main points of dispute between the parties. Malone contends that as a result of the Post Office's actions, he is mentally unable to

---

[40]*Id.* at 28.

[41]Mar. 4 RT at 142.

[42]*Id.* at 143-44.

[43]*Id.* at 149.

[44]*Id.*

[45]*Id.* at 151.

[46]Mar. 4 RT at 22.

[47]*Id.* at 25.

[48]*Id.*

[49]*Id.* at 155-56; Mar 5 RT at 115.

work.  The Post Office contends that Malone is capable of working.  The court first considers the physical limitations on Malone's ability to work.

### 1.   Physical Limitations

23.   Dr. Wright testified that she did not believe Malone's physical restrictions prevented him from working in the future.[50]

24.   Dr. Thomas Grogan, an orthopedic surgeon testified as a defense expert regarding Malone's physical limitations.  Hand injuries makes up 15% of his practice, and he has performed numerous hand surgeries.[51]

25.   Dr. Grogan examined Malone on September 23, 2008; the examination included x-rays of both hands, Malone's shoulders, and neck.[52] Dr. Grogan opined that Malone could lift up to twenty pounds.[53]  He also concluded that Malone did not suffer from carpal tunnel syndrome,[54] and found Malone's shoulders to be in normal condition.[55]

26.   Dr. Grogan concluded that Malone's main problems were the improper positioning of the fusion of his right thumb and degeneration of his left joints, particularly the wrist joint.[56] The only physical restrictions Dr. Grogan would have placed on Malone were no lifting over ten pounds with one hand and no lifting over twenty pounds with both hands.[57]  Like Dr. Wright, Dr. Grogan believed that Malone was physically capable of working.[58]

---

[50]Mar. 5 RT at 56.

[51]*Id.* at 59-60.

[52]*Id.* at 63.

[53]*Id.* at 66.

[54]*Id.* at 68.

[55]*Id.* at 72.

[56]*Id.* at 70.

[57]*Id.* at 72.

[58]*Id.* at 77.

### 2.     Mental Limitations

27.     Dr. Ammon prepared a report for Malone's disability retirement application.   In connection with the report, she administered a variety of tests.  The "Beck Anxiety Test" measures anxiety based on a patient's self-rating of the severity of various symptoms, such as "My heart races fast" and "I feel unsteady."[59]  Malone scored a 43; Dr. Ammon stated that this score indicated "a severe level of anxiety."[60]

28.     Dr. Ammon also administered the "Beck Depression Inventory 2," a self-reported test similar to the Beck Anxiety Test.  Malone scored 35; Dr. Ammon considered this score "severe" as well.[61]

29.     Finally, Dr. Ammon administered the Psycho Diagnostic Screening Questionnaire, another test based on the patient's responses to various statements.  Based on this test, Dr. Ammon concluded that Malone suffered from anxiety and depression, albeit not from any specifically identifiable disorder.[62]

30.     Dr. Ammon found that Malone was "totally disabled" and "not able to return to the labor market."[63]  She stated that his mental problems were not only "related to work" but also to his financial concerns.[64]   Dr. Ammon opined that Malone would have difficulty returning to work because he was "suspicious and mistrustful of others."[65]

31.     Dr. Brian Jacks testified as a defense expert.  In addition to reviewing the record in the

---

[59]Mar. 4 RT at 27.

[60]*Id.*

[61]*Id.* at 28:10.

[62]*Id.* at 30.

[63]*Id.* at 32.

[64]*Id.* at 33-34.

[65]*Id.* at 35.

case, Dr. Jacks interviewed Malone to formulate a diagnosis of his mental condition.[66] Like Dr. Ammon, he administered the Beck Anxiety Inventory and Depression Inventory as well as the Beck Suicide Scale and Wahler Physical Symptoms Inventory. The latter tests are similar to the Anxiety and Depression inventories in that they are based on the patient's written responses to various statements.[67]

32.   Dr. Jacks also administered the Minnesota Multiphasic Personality Inventory ("MMPI"), which he described as "the best psychological test which we have."[68]  Unlike the Beck tests, which consist of 21 questions, the MMPI has 567 qeustions.[69]

33.   Dr. Jacks diagnosed Malone as suffering from dysthymia, a chronic low grade depression, characterized by intermittent mood changes or depression that lasts for at least two years.[70] Dr. Jacks described dysthymia as "a common form of depression" that does not usually cause "major impairments or difficulties in one's ability to function"; he stated that for patients with the condition, "it seems like . . . there's clouds outside even when it's sunshiny, and you feel that life is not satisfying or making you very happy."[71]

34.   Dr. Jacks testified that Malone's depression began in 1998 or 1999, and has not significantly worsened since that.[72]  He noted that from 2005 to 2007, there were no increases or changes in Malone's symptoms, the frequency of his treatment or his medication.[73]

---

[66]*Id.* at 51.

[67]*Id.* at 54.

[68]*Id.* at 55.

[69]*Id.* at 122.

[70]*Id.* at 55.

[71]*Id.* at 56.

[72]*Id.*

[73]*Id.* at 66.

35.   Dr. Jacks identified several causes of Malone's depression: health issues and physical problems; excessive suspiciousness and mistrust of others; difficulty following instructions; and financial problems, as well as the present litigation.[74]

36.   Dr. Jacks opined that Malone should be prescribed anti-depressants but that he did not require further psychological counselling.[75]

37.   Dr. Jacks also stated that, in his opinion, although Malone's depression resulted in a lack of energy and difficulty with concentration, it did not impair his ability to work.[76] He did state, however, that Malone was not able to work for the month of September 2007.[77]

38.   Dr. Jacks was critical of Dr. Ammon's opinions.  He noted that she did not review Malone's complete history, and did not consider whether his health issues were a cause of his depression.[78]

39.   After evaluating the testimony of both experts, the court finds that Malone suffers from mild depression that does not prevent him from working.  In this regard, the court does not find Dr. Ammon's testimony that Malone is "totally disabled" due to psychological conditions credible.  When asked to explain this opinion, Dr. Ammon stated in conclusory fashion that she did not believe Malone could ever return to the Postal Service, and that she believe he was not "at this time" able to return to the labor market.  She offered no specific reasons or analysis supporting this conclusion.[79]  In addition, the court accords Dr.

---

[74]*Id.* at 59-72.

[75]*Id.* at 74.

[76]*Id.* at 77.

[77]*Id.* at 83.

[78]*Id.* at 81-82.

[79]*Id.* at 32.  At a later point, Dr. Ammon referenced Malone's physical limitations – a subject outside her expertise – as well as suspiciousness, mistrustfulness and anxiety as a basis for her opinion that it would be difficult for Malone to  return to gainful employment.  (*Id.* at 35.) Once again, however, she did not describe the manner in which these psychological conditions would make it difficult for Malone to work for an employer other than the Postal Service.

Jacks' testimony greater weight based his credentials, the thoroughness of his testing, and his review of prior medical records.  In particular, Dr. Jacks administered the MMPI test, which revealed that Malone had significant worries and concerns about his physical problems.[80]  He also reviewed medical records indicating, contrary to Dr. Ammon's testimony, that Malone had sleep apnea, which contributed to his depression because he was unable to achieve a deep level of sleep.[81]  Consequently, the court credits Dr. Jacks' testimony that there have been no significant changes in Malone's depression since 2005, and that Malone is presently able to work despite his dysthimia or low grade depression.

**C.     Testimony At Court Trial Regarding Malone's Efforts to Find Employment**

40.   Malone testified that he does not consider himself mentally prepared to return to the work force.[82]  The court does not consider Malone's self-diagnosis an accurate indicator of his psychological capability to work.

41.   Malone did not submit any written applications, cover letters or resumes to employers after leaving the Post Office, nor did he prepare a resume.[83]  He did not attend any job interviews.[84]  Malone testified that during the time he was receiving unemployment benefits, he did not believe he was capable of working and would not have accepted a job if one had been offered to him.[85]

42.   Malone's disability retirement became effective August 2008.[86]  There was no evidence that Malone's disability retirement was approved based on his mental condition rather than

---

[80]*Id.* at 60-61.

[81]*Id.* at 63; compare *id.* at 41.

[82]July 21 RT at 43.

[83]*Id.* at 49.

[84]*Id.* at 50.

[85]*Id.* at 53.

[86]Mar. 4 RT at 158.

his physical disabilities.

43. Malone has not made any efforts to find employment since he began receiving federal disability retirement benefits.[87]

**D.      Testimony of Defendant's Expert Jerald Udinsky**

44. Dr. Jerald Udinsky testified as a defense expert during the bench trial.  Udinsky described himself as a "rehabilitation economist," a position he characterized as "an economist who is specialized in labor markets, employment, wages, and unemployment within labor markets."[88]  He claimed to have a particular speciality in "the labor market activity of people with injuries . . . who have had to change jobs."[89]

45. To form an opinion about the availability of employment for Malone, Udinsky considered Malone's employment record, worker's compensation records, unemployment records, and the depositions of Malone, Dr. Ammon and Dr. Wright; he also spoke with Dr. Grogan.[90]  In addition, Udinsky conducted what he described as a "labor market survey" that focused in particular on the types of jobs for which Malone applied while receiving unemployment insurance.[91]  The positions Udinsky considered were insurance salesman, mail room supervisor, receptionist, customer service representative and security guard.  His labor market survey included calling companies by telephone and inquiring if jobs were available.[92]  Udinsky asked the employers if the jobs required lifting more than 15 pounds.[93]

---

[87]*Id.* at 123; July 21 RT at 44.

[88]July 21 RT at 67:20-21.

[89]*Id.* at 67:23-24.

[90]*Id.* at 75-76.

[91]*Id.* at 76-77.

[92]*Id.* at 91-92.

[93]*Id.* at 93.

46.   Udinsky did not, however, consider Malone's educational background, an omission that considerably undermines the credibility of his opinions.[94]   Udinsky justified this omission on by noting that Malone had "a considerable amount of experience" and could take classes to learn skills he lacked.[95]

47.   Udinsky's analysis also did not take Malone's psychological issues into account.[96]   He simply assumed that Malone was capable of working.[97]

48.   Udinsky expressed a variety of opinions regarding what he considered a "normal and ordinary job search."[98]   The court does not discuss these here, as it can conclude based on Malone's testimony, standing alone, that Malone did not undertake a reasonably diligent effort to obtain employment.   Malone testified that he was simply going through the "protocols," that is, making the minimum effort necessary to continue to receive unemployment insurance and that he had no intention of working or accepting a position if one was offered.[99]

49.   Udinsky testified that he believed Malone could have found employment as a mail room supervisor because he "had skills in shipping and receiving."[100]   He also testified that Malone could manage a store such as "Mailboxes R Us."[101]   The court does not find this opinion credible, given that Malone had no supervisory experience during his thirty years

---

[94]*Id.* at 90.

[95]*Id.* at 90:23-24.

[96]*Id.* at 138.

[97]*Id.* at 140.

[98]*Id.* at 80.

[99]*Id.* at 53.

[100]*Id.* at 86:18.

[101]*Id.* at 89.

1       of work at the Post Office.[102]

2  50.  Udinsky opined that Malone could work as a receptionist.[103]  As Udinsky reached this

3       opinion without considering that Malone had been diagnosed with carpal tunnel syndrome,

4       the court does not find it credible.

5  51.  Because Malone had mentioned looking for work as an insurance salesman at his

6       deposition, Udinsky also considered the field of insurance sales.[104]  He believed that

7       Malone's disabilities as well as his "background . . . in a work environment where there's

8       physical labor involved" gave Malone "experience when it comes to selling disability and

9       liability insurance."[105]  On direct examination, Udinsky testified that he did not consider

10      Malone's level of education in evaluating his ability to succeed as an insurance salesman.[106]

11      According to Udinksy, Malone could pass the licensing exam to work in insurance sales

12      "based on the fact that he had been working at the post office for some time."[107]  Despite

13      this testimony, on cross examination, when asked about the basis for his opinion that

14      Malone could pass the exam, Udinsky cited the fact that Malone had a high school

15      diploma; apparently, he had consulted Malone's deposition during the recess to discover

16      this fact.[108]  Udinsky's testimony regarding Malone's ability to find work in insurance sales

17      considerably undermined his credibility.

18 52.  Udinsky also testified that he believed Malone could find work as a security guard.[109]  He

19 _____

20      [102]*Id.* at 38.

21      [103]*Id.* at 88.

22      [104]*Id.* at 96.

23      [105]*Id.* at 96:22-25.

24      [106]*Id.* at 99.

25      [107]99:23-25.

26      [108]*Id.* at 153.

27      [109]*Id.* at 103.

28

stated that he had selected this position to research because Dr. Wright had stated that it was compatible with Malone's physical restrictions.[110] He acknowledged, however, that some training would be required,[111] as it does not appear to be a comparable position to the lobby director position Malone performed at the Post Office.

53.   Udinsky also testified regarding Malone's ability to find work as a customer service representative.  Of all the positions discussed by Udinsky, this is the only one that the court finds both to be compatible with Malone's education and experience.  It is, moreover, comparable to the lobby director position Malone held at the Post Office. Based on Malone's description, the lobby director job essentially resembles a customer service position.

54.   Udinsky testified that the median income for customer service representatives was $31,873 in 2007.  He testified in 2007-08, this figure increased 1.74 percent.[112]

55.   Udinsky calculated that if Malone had obtained work as a customer service representative on June 19, 2008, he would have earned $33,973 through July 20, 2009, the date of the court trial.[113]  This calculation included Malone's earnings from disability retirement.  It assumed that he would find a job nine months after leaving the post office and that his salary would begin at the 25th percentile.  Udinsky calculated that if Malone continued working as a customer service representative through retirement, his future earnings would be $360,729.  In this regard, he assume that Malone would reach the 75th salary percentile after three years of work.[114]  This translates to a 20 percent salary increase in each of the

---

[110]Id.

[111]Id.

[112]Id. at 107.

[113]Id. at 126.

[114]Id. at 171.  Udinsky provided similar calculations regarding the other positions he identified.  The court has not included these because Udinsky's testimony failed to establish that Malone could obtain those positions or that they were similar to the lobby director position; thus,

first three years, and an increase consistent with inflation thereafter.[115]  Udinsky did not cite any data to support his assumption that Malone would receive a yearly twenty percent salary increase as a customer service representative.  Rather, he apparently based this assumption on his perception that Malone was "a mature person [and] a capable person."[116]  It is not entirely clear how Udinsky formed this opinion of Malone.

56.  Udinsky explained that Malone's receipt of disability retirement did not prevent him from working and that, as long as he earned less than 80 percent of his prior salary at the post office, he would continue to receive payments.[117]

57.  Malone's expert, Anand Khemlani, a certified public accountant, criticized Udinsky's conclusions with respect to the customer service representative, receptionist, and security guard positions.[118]  He argued that Udinsky applied a one hundred percent probability that Malone would be able to obtain these positions, and did not factor in educational licensing requirements, economic conditions, and Malone's lack of personal drive.[119]  The value of Khemlani's criticism was limited, however, as he was unable to identify a specific probability Udinsky should have utilized to account for the factors he identified.[120]

**E.  Stipulated Facts Regarding Malone's Salary and Benefits**

58.  Malone would have earned a total of $111,404 in salary and benefits had he continued to work at the Post Office from September 19, 2007 through July 20, 2009.[121]

---

they are not relevant to the court's damages calculations.

[115]*Id.* at 172.

[116]*Id.* at 173:3.

[117]*Id.* at 108.

[118]*Id.* at 24-25.

[119]*Id.* at 25.

[120]*Id.* at 32.

[121]Second Amended Stipulated Facts for Court Trial at 2; see also *id.*, Table 4.

59. Malone received a total of $45,770 in federal disability retirement benefits through July 20, 2009.[122]

60. Had Malone worked for the Post Office through April 21, 2018, he would have earned $472,566 in salary and benefits reduced to present cash value.  He would have earned $323,754 in retirement benefits, reduced to present cash value, from April 2018 through September 4, 2034, the end of his statistical life expectancy.[123]  For the period from July 21, 2009 to September 4, 2034, Malone would receive a total of $460,152 in disability retirement benefits.[124] While the parties stipulated to these figures, the court does not find them particularly useful, as they appear to reflect a misunderstanding of the nature of the front pay remedy.

61. Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

## II.   CONCLUSIONS OF LAW

### A.   Legal Standards Governing Back Pay, Front Pay & Reinstatement

62. "Title VII of the Civil Rights Act of 1964 permits courts to grant equitable remedies to employees who have been impermissibly discriminated against by employers with fifteen or more employees.  See 42 U.S.C. § 2000e-5(g) (1994).  The relevant remedies include reinstatement and awards of back pay and front pay."[125] *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000).  "The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole."  *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995) (citing *Edwards v. Occidental Chem. Corp.*, 892 F.2d

---

[122]*Id.*

[123]*Id.*

[124]*Id.* at 3.

[125]The Rehabilitation Act incorporates Title VII's remedial procedures.  See *McLean v. Runyon*, 222 F.3d 1150, 1155 (9th Cir. 2000) (citing 29 U.S.C. § 794a).

18

1442, 1448 (9th Cir.1990)).

63.    "Back pay is calculated by subtracting the actual wages a discharged employee earned subsequent to termination from the amount the employee would have earned absent the employer's discriminatory conduct." *E.E.O.C. v. Sunfire Glass, Inc.*, No. CV-08-1784-PHX-LOA, 2009 WL 976495, *11 (D. Ariz. Apr. 10, 2009). Back pay is typically computed "from the date of the discriminatory act until the date of final judgment." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986). Back pay awards "advance 'Congress' intent to make "persons whole for injuries suffered through past discrimination."'" *Caudle*, 224 F.3d at 1020 (quoting *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). Accordingly, "once a court finds unlawful discrimination, backpay should be denied only if denial 'would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.'" *Thorne*, 802 F.2d at 1137 (quoting *Albemarle Paper*, 422 U.S. at 421)); see also *Caudle*, 224 F.3d at 1202; *Odima*, 53 F.3d at 1495.

64.    "Front pay is the term used to describe damages paid as [prospective] compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Caudle*, 224 F.3d at 1020 (quoting *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir.1984), overruled on other grounds, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (alteration original)).

65.    "[R]einstatement, when it is feasible, is 'the preferred remedy' in a discrimination suit." *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148, 1156 (9th Cir. 1999) (quoting *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1346 (9th Cir. 1987)). Nonetheless, "[a]wards of front pay are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties." *Thorne*, 802 F.2d at 1137 (citing *Fadhl*, 741 F.2d at 1167).

66.    A plaintiff seeking an award of back pay or front pay has a duty to mitigate damages by

19

making reasonably diligent efforts to obtain alternative employment.  *Caudle*, 224 F.3d at 1020 (citing 42 U.S.C. § 2000e-5(g)(1)).  In regard to front pay, the Ninth Circuit has observed:

> "A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future.  '[F]ront pay awards . . . must be reduced by the amount plaintiff could earn using reasonable mitigation efforts. . . .  Thus, front pay is intended to be temporary in nature.  An award of front pay does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing.'  *Cassino*, 817 F.2d at 1347 (citations and quotations omitted).  'Because of the potential for windfall, [front pay's] use must be tempered.'  *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)."  *Gotthardt*, 191 F.3d at 1157.

67. Defendant bears the burden of establishing plaintiff's failure to mitigate.  *Odima*, 53 F.3d at 1497.  To satisfy this burden, defendant must prove that "during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, *and* that [the plaintiff] failed to use reasonable diligence in seeking one."  *Id.* (quoting *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir.1994) (alteration and emphasis original)); see also *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978) ("To satisfy this burden, defendant must establish (1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position").

68. On the other hand, the Ninth Circuit has held that back pay and front pay are not warranted where a plaintiff voluntarily withdraws from the workforce.  *Caudle*, 224 F.3d 1020-2; see also *Thorne*, 802 F.2d at 1136 ("Our court has recognized, however, that the backpay period may terminate earlier if the plaintiff has voluntarily removed herself from the job market," citing *Sangster v. United Airlines, Inc.*, 633 F.2d 864, 868 (1980)).

**B.      Calculation of Back Pay**

69.   The difference between the amount Malone would have earned at the Post Office through the date of judgment and the federal disability benefits he received through judgment is $78,022.95.[126]  This is the amount of back pay to which Malone is entitled before further mitigation is considered.

70.   As noted above, the court has found that Malone did not exercise reasonably diligent efforts to find alternative employment at any time after leaving the Post Office.  Even discounting Udinksy's opinions regarding what constitutes a reasonable job search, Malone's own testimony is sufficient to establish that he did not make a reasonable effort to find work.  During the period Malone was receiving unemployment, before he began to receive disability payments, he did not prepare a resume, mail applications, or attend interviews.  While he filled out the forms necessary to receive unemployment benefits,[127] and made certain inquiries about the jobs he listed on the form, Malone's testimony made it clear that he did not really attempt to find work.  Indeed, his testimony that he would not have accepted a job during the period he was receiving unemployment underscores the fact that he did not make any real effort to locate work.  After Malone began receiving disability payments, he ceased all efforts to find work.  Based on these facts, the court concludes that the Post Office satisfied the second prong of the showing it must make to establish that

---

[126]The figures provided by the parties are based on the time period between September 19, 2007, the date Malone ceased work at the Post Office, and July 20, 2009, the date of the court trial.  To calculate the additional wages Malone would have earned for the time period between the conclusion of the court trial and date of judgment, the court utilized the daily wage to which the parties stipulated – $143.60 – and the daily amount of disability retirement benefits to which the parties stipulated – $71.15.  (See Amended Stipulated Facts for Court Trial, ¶¶ 1, 2.) Multiplied by the average number of days per month to which the parties stipulated – 30.4 – this yields additional wages of $24,555.60 and additional disability retirement benefits of $12,166.65. Total wages that might have been earned had Malone remained employed at the Post Office, therefore, are $135,959.60, while disability retirement benefits actually received are $57,936.65. The difference between these two numbers is $78,022.95.

[127]July 21 RT at 47.

Malone did not reasonably attempt to mitigate damages. The Post Office must also establish, however, that comparable jobs were available. *Odima*, 53 F.3d at 1497.

71. While the Post Office offered Udinsky as an expert to satisfy this aspect of its burden, his testimony had substantial credibility problems. Udinsky opined that Malone could obtain positions that required specific skills and experience without fully considering Malone's background. Thus, the court must reject the majority of Udinsky's testimony. It credits, however, Udinsky's conclusion that Malone could have found work in the customer service field. Unlike other opinions Udinshy offered, this opinion was corroborated by Malone's own testimony that he enjoyed and could perform the lobby director position. Further, neither Dr. Wright nor Dr. Grogan testified that Malone's physical limitations would prevent him from succeeding in a customer service position. The court therefore concludes that the Post Office has carried its burden of establishing that it is more likely than not that Malone could have found a customer service position, and that such a position would have been substantially similar to his previous lobby director position. As to the time within which Malone could have found such a position, the court finds Udinsky's estimate that he would have had to undertake a nine-month job search reasonable. Udinsky testified that if Malone had obtained a customer service position on June 19, 2008, he would have earned $33,973 through July 20, 2009. This equals $86.01/day ($33,973/395 days). Accordingly, the court finds that, had Malone made reasonable efforts to mitigate his damages, he would earned $49,282.78 through the date of judgment. Thus, the court concludes that Malone is entitled to $28,740.17 in back pay.

72. The court cannot accept the Post Office's argument that, because Malone did not make reasonable efforts to find work, he is not entitled to economic damages. The Ninth Circuit in *Odima* expressed disapproval of the rule that "[i]f an employer proves that a plaintiff failed to look for work, the employer is not required to prove that jobs were available." *Id*. It observed that "[defendant] notably cites no Ninth Circuit authority for this purported

exception to the general rule, and we can find none."[128]   Although the Post Office has carried its burden of proving that customer service jobs were available to Malone, it has not established that jobs were available that would have paid him the equivalent of his Post Office salary.  Malone is entitled to an award of back pay equal to the difference between what he would have earned at the Post Office absent its illegal conduct and what he could have earned had he made reasonable mitigation efforts.  See *Loeffler*, 486 U.S. at 558 (purpose of back pay is to make plaintiff whole).

73.   The Post Office's argument to the contrary relies on *Caudle*, in which the Ninth Circuit held that plaintiff's "withdrawal from the workforce in September 1995 barred her recovery [of lost wages] under Title VII as of that date because the withdrawal was voluntary."  224 F.3d at 1020.  In *Caudle*, plaintiff was terminated in March 1995, when she was eight months pregnant.  She gave birth in April 1995 and began seeking employment without success.  *Id.* at 1019.  In September 1995, plaintiff "elected to stay at home with her child for a period that she originally anticipated would last approximately three years."  *Id.*  The Court explained:

> "The [district] court apparently found Caudle's decision to withdraw
> from the workforce [was] not only uncompelled by her situation but
> also unaffected by the defendant's discriminatory behavior.   In
> holding that the voluntariness of Caudle's withdrawal precluded her
> recovery for lost pay during the ensuing period, the district court
> correctly focused on the general objective underlying Title VII
> remedies and the plaintiff's duty to mitigate damages generally:

---

[128]Technically, the court did not reach the issue because it found that the plaintiff had sought work.  Subsequent courts have cited *Odima*, however, for the proposition that the Ninth Circuit "places the burden on Defendant to prove both that there were substantially equivalent jobs available and that plaintiff failed to use reasonable diligence in seeking one."  See, e.g., *Kawar v. JPMorgan Chase and Co.*, No. CV-08-0046-PHX-DGC, 2009 WL 1699818, *6 (D. Ariz. June 16, 2009); *Santana v. Westaff, Inc.*, No. Civ. 02-572-KI, 2003 WL 21087731, *6 (D. Or. May 5, 2003).

ensuring that the plaintiff is made whole.  Caudle never alleged (and
there is no reason otherwise to believe) that her decision to withdraw
from the workforce in September 1995 was in any way affected by
Bristow's discriminatory termination of her employment.  She
therefore failed to show that her diminished income after that date
was not 'voluntary' and was thus an injury for which she would need
to be 'made whole' by Bristow.  Absent any injury, an award of back
pay or front pay is plainly unwarranted under 42 U.S.C.
§ 2000e-5(g)(1). "  *Id.* at 1020-21 (alterations added and footnote
omitted).

74.   Malone's situation differs from Caudle's.  The district court found that Caudle left the
labor market to care for her child, a decision unrelated to her prior termination.  Malone,
by contrast, applied for disability retirement only after the Post Office failed to provide the
type of reasonable accommodation to which the jury found he was entitled.  Malone's
situation resembles that of the plaintiff in *Szedlock v. Tenent*, 139 F.Supp.2d 725 (E.D.
Va. 2001).  There, plaintiff left her employment at the CIA and applied for medical
disability retirement after the CIA failed to reasonably accommodate her.  *Id.* at 728-29.
Defendant advanced essentially the same argument put forth by the Post Office here.  It
contended that "neither a back pay nor a front pay award is warranted because defendant's
unlawful conduct – the failure to provide reasonable accommodations – did not result in
plaintiff's discharge and claim for lost wages.  Instead, any lost wages were the result of
plaintiff's voluntary pursuit of a medical disability retirement."  *Id.* at 733.  The court
rejected the argument:

"Defendant's argument fails ultimately because plaintiff's pursuit and
acceptance of the [disability retirement] was the direct result of
defendant's failure to accommodate her disability.   Simply put,
when defendant failed, over an extended period of time, to
accommodate plaintiff's disability . . . and when defendant thereafter

24

concluded that there were no positions in the CIA, at plaintiff's experience level, in which she could perform with or without a reasonable accommodation – she was left with no option but to pursue and accept the [disability retirement]. It follows, then, that her lost wages are a direct result of defendant's unlawful conduct. Thus, it was defendant's failure to provide plaintiff with the reasonable accommodations she sought – to which the jury found she was legally entitled – that compelled plaintiff to seek and accept the [disability retirement]. In a real sense, plaintiff's claim for lost wages is the result of discrimination, and she is thus entitled to some equitable relief in the form of back pay or front pay to place her in the position she would have enjoyed absent discrimination. See *Albemarle*, 422 U.S. at 421." *Id.*

75.   The court similarly cannot accept Malone's argument that he had no obligation to mitigate damages because the Post Office's conduct caused him mental distress that rendered him unable to work. Malone cites several cases for the proposition that under Title VII, "an employee who cannot mitigate damages because of the unlawful actions of the employer can still receive back pay." See *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 384 (1st Cir. 2004); see also *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 794 (11th Cir. 1999) ("[A] Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability"); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir.1999) ("Because [the employer's] conduct affirmatively impaired [the employee's] ability to mitigate her damages, it would be inequitable to reduce her back pay award in this case"). This principle has no application in the present case, because Malone's psychological capability to work is a factual question, and the court has found that he is mentally capable of working. As Malone's psychological issues do not prevent him from working, the court need not consider the degree to which such conditions were "caused" by the Post Office. Malone argues that

the jury's award of emotional distress damages indicates that it credited Dr. Ammon's testimony that Malone would be unable to work in the future. Malone's psychological capacity to work in the future was simply not before the jury, and the court does not find Dr. Ammon's testimony regarding Malone's ability to work credible.[129]

76.   Although neither party has briefed the issue, "[a]n award of prejudgment interest on a back pay award is appropriate." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984). The interest rate used to calculate prejudgment interest is within the discretion of the trial judge. *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir. 1984). This discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty. *Id.*; *Jung v. Potter*, No. CV 04-429-PHX-MHM, 2008 WL 2620905, *6 (D.Ariz. July 1, 2008). In calculating prejudgment interest, the court will use the weekly average Treasury Bill rate, see *id.*, see also *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) ("Generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate,'" quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163-64 (9th Cir. 2001)), and calculate interest at the date of judgment. On January 15, 2010, the

---

[129]Moreover, the jury need not have credited Dr. Ammon's testimony to have awarded Malone emotional distress damages. It could, for example, have relied on the following testimony:

"Q: [ ] How has [not being able to work at the post office] impacted your life?
A: It caused a financial hardship. It caused problems with my personal life and home, my wife. I just don't know what the future holds for me.
Q: What type of problems are you having with your wife at this point?
A: Relationship problems. As far as how the bills going to get paid, and there's not much romance going on these days. So – and I don't even feel that anyway because I just don't know what the future holds for me, for Earnest Malone." (Mar. 4 RT at 159.)

It could also have credited testimony regarding the fact that Malone was unable to pay his mortgage and awarded damages for the emotional distress associated with that situation. (See *id.* at 33.)

1    applicable rate was 0.41%, yielding prejudgment interest of $271.50.

2    **C.    Availability of Reinstatement**

3    77.    As noted, "reinstatement, when it is feasible, is 'the preferred remedy' in a discrimination

4    suit." *Gotthardt*, 191 F.3d at 1156.  The court has seriously considered the possibility of

5    awarding reinstatement.  Considering Malone's testimony that working at the Post Office

6    is the only job that interests him, and his unwillingness to look for work elsewhere, the

7    court believes that reinstatement has considerable appeal as an appropriate equitable

8    remedy.  The court does not believe, despite Malone's contention to the contrary, that this

9    is a case where hostility between the parties would prohibit reinstatement.  During the ten

10   years prior to this litigation, Malone filed at least ten employment discrimination claims

11   against the Post Office, indicating that the parties had an ability to co-exist as employer-

12   employee while at the same time being legal antagonists.  While this case may have

13   generated some additional hostility between the parties, the court does not believe,

14   considering their past history, that the hostility is so excessive as to foreclose

15   reinstatement.

16   78.    The court concludes that reinstatement is impossible for a different reason, however.  The

17   position of lobby director has apparently been eliminated throughout the Los Angeles

18   Postal District since March 2009.[130]  The testimony at trial indicated that lobby director

19   was the only existing position at the Post Office that Malone was capable of performing

23   [130]This fact was not adduced at either the jury or the bench trial; rather, it is included in
24   the declaration of Koula Fuller, Beverly Hills Postmaster and Team Leader for the Los Angeles
     Postal District's National Reassessment Process District Assessment Team.  Fuller's declaration
25   is attached to the Post Office's trial brief.  (Declaration Koula Fuller, ¶ 3.)  Fuller states that
     "'lobby directing' is no longer an operationally necessary task due to the decrease in mail volume
26   and the concomitant decrease in lines in the Los Angeles Postal District." (*Id.*)  Although this
27   declaration was presented as evidence post-trial, Malone cites to and relies on it in support of his
     argument that reinstatement is inappropriate.  Accordingly, the court will consider the elimination
28   of the lobby director position for purposes of assessing the propriety of reinstatement.

within his restrictions.[131]   As there is no indication that any position that Malone can perform is presently available at the Post Office, the court finds that reinstatement is not appropriate at this time.  It therefore considers the appropriate front pay award.

### D.      Calculation of Front Pay

79.    The evidence presented during the court trial and in both parties' post-trial briefs reflects a fundamental misunderstanding of the nature of front pay.  Front pay is intended to be a *temporary* award.  As the court stated in *Glenn-Davis v. City of Oakland*, No. C 02-2257 SI, 2008 WL 410239, *3 (N.D. Cal. Feb. 12, 2008), prior to adopting a three-year front pay period:

> "The Ninth Circuit has noted, in the context of discussing a plaintiff's duty to mitigate damages, that 'front pay is intended to be temporary in nature.'  *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir.1987); see also *Boehm v. American Broadcasting Co., Inc.*, 929 F.2d 482, 488 (9th Cir. 1991) (noting that 6 year front pay period 'is longer than customary in federal discrimination actions, [but] it is not so unsound as to warrant reversal').   In addition, courts have noted that '[t]he longer a proposed front pay period, the more speculative the damages become.'  *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002) (internal citation and quotation omitted)."

80.    Malone seeks to recover salary and benefits through 2018, and retirement benefits through 2034 – a front pay period of twenty five years.  The court has not identified a single case in which front pay was awarded for so long a period.  In fact, in *Peyton*, the D.C. Circuit concluded that an "award of 26 years of front pay was unduly speculative and therefore an abuse of discretion."  287 F.3d at 1129; cf. *Gotthardt*, 191 F.3d at 1157 (noting that

---

[131]Malone was also capable of performing a position known as DA-CFS mail, but this position was eliminated prior to the time of trial.

district's court award of an eleven-year front pay period "seem[ed] generous," but concluding that it was not an abuse of discretion under the circumstances of the case). While it might have been expected that the Post Office would argue for a more reasonable front pay period, it appears to have accepted Malone's position that the appropriate period is the remainder of his life expectancy. This may well have been because Udinsky's opined that, coupled with his disability retirement payments, Malone's earnings from employment over this period would exceed what he could have earned had he remained employed at the Post Office.[132] The court must therefore exercise its discretion to determine the appropriate length of the front pay period.

81. "Factors that courts have considered in determining the amount of a front pay award include: (1) the length of prior employment; (2) the permanency of the position held; (3) the nature of the work; (4) the age and physical condition of the employee; (5) possible consolidation of jobs; and (6) myriad other nondiscriminatory factors which could validly affect the employer/employee relationship." *Sanders v. City of Newport*, 602 F.Supp.2d 1195, 1201-02 (D. Or. 2009) (citing *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 871 (5th Cir.1991)).

82. Evaluating these factors, Malone had worked for the Post Office nearly twenty years at the time his employment terminated. By itself, this tends to indicate that Malone would have remained at the Post Office for a significant time.

83. On the other hand, the permanency of the position Malone held prior to termination suggests that a front pay period of more than several years would be unduly speculative. Although Malone's letter carrier position was permanent in the sense that he was not hired on a temporary basis, the fact that Malone's employment depended on the availability of limited duty positions adds an element of speculativeness to his continued future employment. Based on the evidence at trial, the jury could have concluded that permitting Malone to remain as a lobby director rather than transferring the position to a window

---

[132]See, e.g., July 21 RT at 121-22.

clerk was a reasonable accommodation which the Post Office could have provided without undue hardship.  Considering the elimination of the lobby director position, however, it is uncertain whether it would have continued to be economically feasible for the Post Office to employ Malone in that capacity for a significant period into the future.  As there was no evidence that Malone could perform any other position at the Post Office, the length of time for which he would have been able to continue working for the Post Office is highly speculative.

84.   Further, Malone's physical condition adds to the speculative nature of his continued ability to work for the Post Office.  Dr. Wright regularly added to Malone's physical limitations.  Considering this, it is likely that his limitations would have reached a point where the Post Office would no longer have been able to accommodate him.

85.   Finally, Malone's deposition testimony indicated that he contemplated retiring at age 58.[133] At trial, Malone attempted to explain that he did not in fact mean that he would retire at 58. He testified that what he meant was "if my health was good [at 58] and I was feeling good, I would have kept working."[134]  Considering Malone's incentives to testify that he would have worked for a longer period, the court does not find this testimony credible; the court's credibility determination is reinforced by Malone's arguably fraudulent conduct in applying for unemployment benefits despite his belief that he was unable to work and his unwillingness to accept a job if one were offered to him.  Finally, given Malone's mental and physical issues, the court finds it unlikely that he would have continued "feeling good" past age 58.

86.   Considering all the evidence in the record, the court finds that it would be unduly speculative to conclude that Malone would have continued his employment with the Post Office longer than five years, even absent the discriminatory and retaliatory conduct found by the jury.  The court accepts Malone's testimony that he intended to work until age 58;

---

[133]Mar. 4 RT at 158:24.

[134]*Id.*

30

however, considering his health problems, and the uncertain future availability of work within his increasing physical restrictions, the court concludes he is unlikely to have continued work after age 58, and would likely have taken disability retirement at that point. Under the circumstances, and particularly considering Malone's testimony that he intended to stop working at age 58, the court finds that a five-year period of front pay is sufficient to place Malone in the position he would have occupied but for the Post Office's discriminatory actions. Accordingly, Malone is entitled to five years of front pay. Cf. *Jung*, 2008 WL 2620905 at *3 (awarding front pay for five years to a postal worker who had been performing temporary light duty tasks and who prevailed on Rehabilitation Act claim).

87.  The stipulated facts indicate that Malone's annual earning capacity at the Post Office beginning in 2009 was $61,330.[135] The court has concluded that Malone could have mitigated his damages by obtaining a customer service job. To calculate the amount of mitigation that should be offset, the court will use the median salary for customer service representatives identified by Udinsky, $31,873.[136] Applying Malone's annual disability retirement benefit of $25,951,[137] his annual loss over the front pay period was $3,506.00. Accordingly, Malone is entitled to $17,530.00 in front pay.

88.  Any conclusions of law that are deemed to be findings of fact are incorporated herein as such.

---

[135]Second Amended Stipulated Facts for Court Trial, Table 4.

[136]The court declines to use the 25th percentile salary and to increase it to the 75th percentile over three years, as Udinsky failed to substantiate his opinion that Malone would receive such increases. Using the median salary to which Udinsky testified, however, credits his opinion that Malone might have accepted a lower salary to start in order to secure employment (July 21 RT at 110, 111-12), and also credits the fact that Malone would have received appropriate salary increases (albeit not 20 percent annual increases) over the five year period.

[137]Second Amended Stipulated Facts for Court Trial at 2, Table 6.

1

### III. CONCLUSION

2        For the reasons stated, the court concludes that Malone is entitled to $28,740.17 in back

3  pay, $271.50 in prejudgment interest, and $17,530.00 in front pay.  The court will enter judgment

4  for these amounts and for the $300,000 in emotional distress damages awarded by the jury.

5

6  DATED: January 15, 2010

7                               MARGARET M. MORROW
                            UNITED STATES DISTRICT JUDGE